NATIONAL RESOURCES DEFENSE
COUNCIL, et al, Plaintiffs,

v.

Spencer ABRAHAM, Secretary, Dept.
Of Energy;  United States of
America Defendants.

No.  CIV.01–0413–S–BLW.

United States District Court,
D. Idaho.

July 3, 2003.

Laird J Lucas, Land & Water Fund of
the Rockies, Boise, ID, Eric R Glitzen-
stein, Meyer & Glitzenstein, Washington,
DC, Geoffrey H Fettus, Natural Resources
Defense Council, Washington, DC, Thomas
A Zeilman, Yakima Nation Office of Legal

Counsel, Toppenish, WA, Eric R Glitzenstein, for Natural Resources Defense Council, Snake River Alliance, petitioners.

Barry A Weiner, U.S. Dept of Justice, Washington, DC, Environment Division, Solicitor–DOE, U.S. Dept of Energy, Lisa E Jones, U.S. Dept of Justice, Environment & Natural Resources Division, Washington, DC, for Bill Richardson, Secretary, Department of Energy, USA, respondents.

Brandelle Gail Whitworth, Shoshone-Bannock Tribes, Fort Hall, ID, for Shoshone-Bannock Tribes.

Darrell G. Early, Office of Atty. Gen., Div. of Environmental Quality, Boise, ID, for State of Idaho.

Joseph E. Shorin, III, David K. Mears, Office of Atty. Gen., Olympia, WA, for State of Washington.

Charles M. Broscious, Troy, ID, Samuel L. Finklea, III, Carlisle Roberts, Jr., Office of General Counsel, SC Dept. of Health and Environmental Control, Columbia, SC, for Environmental Defense Institute Inc.

David E. Leith, Atty. Gen., Salem, OR, Darrell G. Early, Office fo Atty. Gen., Div. of Environmental Quality, Boise, ID, for State of Oregon.

## MEMORANDUM DECISION

WINMILL, Chief Judge.

### INTRODUCTION

The Court has before it cross-motions for summary judgment raising the issue whether Order 435.1 issued by the Department of Energy is valid. The Court finds that it is invalid, and hence will grant the plaintiffs' motion, and deny the Government's motion, for the reasons expressed below.

### BACKGROUND FACTS

In the 1950s, the National Academy of Sciences determined that high-level nuclear waste could be disposed of safely in a repository deep underground. During the same time period, Congress, in the Atomic Energy Act (AEA), granted to the DOE's predecessor agency the authority to manage nuclear waste, and allowed private companies the right to own and operate nuclear reactors.

Over the next 30 years, scientists studied different types of underground sites, ranging from salt deposits to basalt, to dispose of the waste from these reactors. In 1982, Congress passed the Nuclear Waste Policy Act (NWPA), officially adopting the underground repository concept as the nation's long-term strategy for disposing of the most hazardous nuclear waste. The Act authorized the Department of Energy (DOE) to find, build, and operate such a repository. DOE selected nine potential sites, and in 2002, Congress approved the site in Yucca Mountain, Nevada.

While the repository was being studied and selected, nuclear reactors around the country were producing nuclear waste. The fuel that runs nuclear power plants is made up of small uranium and plutonium pellets placed in long metal fuel rods. The rods are bombarded with neutrons, causing the uranium and plutonium atoms to gain a neutron, become unstable, break apart, and release heat, among other things. The heat is used to boil water into steam, which drives turbines to create electricity.

After frequent bombardments, the fission reaction becomes inefficient and the rods are removed. Even so, the uranium and plutonium pellets are not entirely spent, and contain a large amount of energy potential. To extract the still-usable isotopes, the pellets are dissolved in an acid bath. This reprocessing procedure leaves highly radioactive particles suspended in an acid chemical solution as a liquid waste. The acid is neutralized and the liquid is placed in storage tanks. Over time, the particles sink to the bottom of the tanks forming a sludge while the liquid remains on top.

The reprocessing waste from nuclear weapons production is stored mainly at three sites: (1) the INEEL facility in Idaho; (2) the Hanford site in Washington; and (3) the Savannah River site in South Carolina. Hanford stores over 53 million gallons of waste in 177 underground tanks. Savannah River has over 34 million gallons, and the INEEL has over 900,000 gallons.

In NWPA, Congress defined the term "high-level radioactive waste" (HLW) to mean

(A) the highly radioactive material resulting from the reprocessing of spent nuclear fuel, including liquid waste produced directly in reprocessing and any solid material derived from such liquid waste that contains fission products in sufficient concentrations; and

(B) other highly radioactive material that the Commission, consistent with existing law, determines by rule requires permanent isolation.

NWPA goes on to state that the President shall determine if HLW resulting from defense activities will be placed in its own separate repository or in a repository also used to store commercially-produced waste. *See* 42 U.S.C. § 10107. If the President determined that no separate repository was needed for the defense waste, "the Secretary shall proceed promptly with arrangement for the use of one or more of the repositories to be developed ... for the disposal of such waste." That provision goes on to state that "[s]uch arrangements shall include the allocation of costs of developing, constructing, and operating this repository or repositories." *See* 42 U.S.C. § 10107(b)(2).

In 1999, DOE issued Order 435.1, and an interpretative Manual, to govern the disposal of HLW at Hanford, INEEL, and Savannah River. One part of that Order defines a process by which HLW may be determined to be incidental waste and exempted from the NWPA requirements governing HLW. Incidental wastes, DOE explains, "do not warrant geologic repository disposal because of their lack of long-term threats to the environment and man." *See Order 435.1 Guidance* at 11–18.

To implement this policy, the Order redefines HLW as incidental waste if it meets the following criteria: (1) key radionuclides must be removed to the extent technically and economically practical; (2) the waste must meet safety requirements comparable to the performance objectives set out in 10 C.F.R. part 61, Subpart C; and (3) the waste must be managed in accordance with DOE's requirements for low-level waste as set forth in Chapter IV of the Manual, provided the waste is incorporated into a solid physical form that does not exceed concentration limits for Class C low-level waste set out in 10 C.F.R. § 61.55, or must meet such alternative requirements for waste classification and characterization as DOE may authorize.

NRDC challenged this Order by filing suit in this Court. DOE responded with a motion to dismiss raising standing and ripeness challenges, among others. The Court rejected those challenges, finding that the case was ripe for review and that the plaintiffs had standing.

The parties have now filed cross-motions for summary judgment. NRDC claims that DOE has exceeded its authority by attempting through Order 435.1 to revise the definition Congress set for HLW in NWPA. DOE counters that NWPA does not apply to defense reprocessing waste, the type of waste stored at Hanford, IN-EEL, and Savannah River. Even if defense wastes are governed by NWPA, DOE contends, Order 435.1 complies with NWPA. NRDC responds that defense wastes are covered by NWPA, and that Order 435.1 conflicts with that Act.

## ANALYSIS

### 1. *Ripeness*

DOE has again raised the argument that this case is not ripe for review. DOE cites in support the recently decided case of *National Park Hospitality Assn. v. Dept. of Interior,* —— U.S. ——, 123 S.Ct. 2026, 155 L.Ed.2d 1017 (2003). This case did not change the law of ripeness, and its analysis does not persuade the Court to change its opinion. The Court issued a detailed ruling on the ripeness issue in its earlier decision, and reaffirms that decision here.

### 2. *NWPA's Applicability to Defense Waste*

■ DOE argues that "Congress did not intend that NWPA would apply to

atomic energy defense facilities," and urges the Court to reconsider its earlier rejection of this argument in a decision filed August 3, 2002. *See DOE Brief* at p. 21. In that decision, the Court held that DOE was required by NWPA to dispose of defense HLW in a repository established under NWPA. In seeking a reconsideration of that decision, DOE contends that President Reagan's determination that no separate repository for defense waste was needed did not trigger a DOE duty to dispose of defense waste in a NWPA repository but only "require[d] that [DOE] allocate to the Government the costs associated with any disposal of defense HLW in a commercial repository that in fact occurs." *See DOE Reply Brief* at p. 2. In essence, DOE contends that it can choose whether to dispose of its defense waste in Yucca Mountain or elsewhere.[1]

■ This interpretation is inconsistent with NWPA. In § 10107(b)(2), quoted above, NWPA states that the Secretary "shall proceed promptly with arrangement for the use of one or more of the repositories" to dispose of defense HLW. The use of the term "shall" means that the direction is mandatory and does not allow for discretion on the part of the agency. *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach,* 523 U.S. 26, 31, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998). Thus, DOE does not have discretion to dispose of defense HLW somewhere other than a repository established under NWPA.

■ DOE's argument that its sole duty is to allocate costs ignores language in NWPA. The provision of § 10107(b)(2),

---

1. The Nuclear Regulatory Commission (NRC) takes the same view. *See* 65 Fed.Reg. 62377, 62378 n. 10 (Oct. 18, 2000) ("Neither the NWPA nor 10 CFR Part 60 requires HLW to

be disposed of in a geologic repository."). Moreover, the NRC agrees with DOE that Order 435.1 is a proper exercise of DOE's statutory authority. *See* AR 34362.

quoted above, states that DOE's duty is to proceed promptly "with arrangement" to dispose of the defense HLW in a repository, and then states that "[s]uch arrangements shall include the allocation of costs of . . . this repository." DOE's reading of subsection (b)(2) ignores the word "include" and treats the phrase regarding cost allocation as a limitation on its duty. That reading violates a cardinal rule of statutory interpretation that no word be ignored. *United States v. Luna–Madellaga*, 315 F.3d 1224, 1230 (9th Cir.2003). The word "include" is used to introduce illustrative examples, and is not a term of limitation. *See Federal Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100, 62 S.Ct. 1, 86 L.Ed. 65 (1941) (holding that "the term 'including' is not one of all-embracing definition, but simply connotes an illustrative application of the general principle."); *Federal Trade Commission v. MTK Marketing*, 149 F.3d 1036 (9th Cir.1998) (holding that term "including" does not connote limitation). Thus, subsection (b)(2)'s discussion of cost allocation is simply one illustration of the various arrangements DOE must make to dispose of defense HLW in a NWPA respository.

DOE's description of its duty is not consistent with the description offered by President Reagan in his determination. There, President Reagan states that the DOE recommended to him that it "proceed with plans and actions to dispose of defense waste in a commercial repository," not just make a cost allocation. *See* A.R. 44673. Even eleven years later, in 1996, the DOE believed that President Reagan's determination triggered its duty, under NWPA, "to proceed with plans and actions to dispose of defense waste with commercial spent nuclear fuel in a single repository." *See DOE, Civilian Radioactive*

*Waste Management Program Plan, Revision 1, May 1996* (excerpted in Natural Resources Journal, *Appendix A* (Fall 1996)).

Congressional intent also weighs against DOE's interpretation. Senator Alan Simpson, in addressing an amendment that eventually became § 10107, discussed the need for a "unified disposal system as an alternative to separate, duplicative systems of civilian and defense repositories," and then stated that the amendment "would remedy this deficiency by *requiring the President . . . to proceed with a unified system* unless be [sic] determines there is a demonstrated clear need for a defense-only repository." *See* 128 Cong. Rec. Part 6, p. 8219 (Appendix 7) (emphasis added).

For all these reasons, the Court does not find persuasive DOE's arguments that NWPA does not apply to defense HLW. The Court therefore refuses to reconsider its earlier decision on this issue.

### 3. *Legality of Order 435.1*

When a court reviews an agency's construction of a statute it administers, the threshold issue is "whether Congress has directly spoken to the precise question at issue." *Chevron U.S.A. Inc. v. N.R.D.C*, 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). If Congress has so spoken, and its intent is clear, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 843, 104 S.Ct. 2778.

In this case, Congress defined HLW in NWPA as "highly radioactive material resulting from the reprocessing of spent nuclear fuel." Congress then used the word "including" to signal that what followed were examples designed to illus-

trate the definition just given. The two examples are (1) "liquid waste produced directly in reprocessing"; and (2) "solid material derived from such liquid waste that contains fission products in sufficient concentrations."

These two examples neatly cover the manner in which the waste separates in the tanks over time. As discussed above, the solids sink to the bottom, forming a sludge, leaving the liquids on top. This physical separation is analogous to NWPA's definitional separation: The liquid and solids are treated differently by the Act. While NWPA allows DOE to treat the solids to remove fission products, thereby permitting reclassification of the waste, NWPA does not offer the option of reclassification for liquid waste produced directly in reprocessing.

DOE interprets NWPA much differently. According to DOE, NWPA defines HLW as " 'highly radioactive material resulting from reprocessing' 'that contains fission products in sufficient concentrations.'" *See DOE Brief* at p. 31. Once again, DOE is ignoring the word "includes" in the statute. As discussed above, the well-established rules of statutory construction prohibit such a reading. *See Federal Land Bank,* 314 U.S. at 100, 62 S.Ct. 1. When the word "includes" is not ignored, the following phrase referring to concentrations of fission products applies only to solid material derived from the liquid waste, and is not part of the general definition of HLW.

NWPA's definition of HLW considers both the source of the waste and, in the case of solids derived from liquid waste, its hazard. It is undisputed that the waste stored at Hanford, INEEL, and Savannah River is highly radioactive and the result of reprocessing. No solids have yet been extracted from the liquid waste at those sites and treated to reduce fission products. Thus, the waste at issue in this case falls within NWPA's definition of HLW.

DOE issued Order 435.1 to govern reclassification of that waste. That Order, according to DOE, sets forth three criteria, "each of which must be met," to reclassify HLW as low-level waste. *See DOE Brief* at 37. This rigorous process, DOE implies, will protect against arbitrary action. However, one of those "three criteria" is not a benchmark that could be "met." It requires that HLW reclassified as low-level waste must meet "safety requirements comparable to the performance objectives set out in 10 C.F.R. 61, Subpart C ...." In other words, DOE will treat waste that it deems to be low-level waste as low-level waste. This is not a "third criteria" that must be "met" but is simply a statement of intent or fact.

There are really only two criteria that must be met. The first is that key radionuclides are removed to the extent technically and economically practical. This means that if DOE determines that it is too expensive or too difficult to treat HLW, DOE is free to reclassify it as incidental waste.

The second is that HLW incorporated into a solid form must either meet the concentration levels for Class C low-level waste or meet such alternative requirements for waste classification and characterization as DOE may authorize. These "alternative requirements" are not defined, and thus are subject to the whim of DOE.

■ While DOE has the authority to "fill any gap left ... by Congress," *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778, it does not have the authority "to adopt a policy that directly conflicts with its governing

statute." *Maislin Indus., Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 134–35, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990). DOE's Order 435.1 directly conflicts with NWPA's definition of HLW. NWPA's definition pays no heed to technical or economic constraints in waste treatment. Moreover, NWPA does not delegate to DOE the authority to establish "alternative requirements" for solid waste. Because Congress has spoken clearly on that subject, "that is the end of the matter," *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778, leaving no room for "alternative requirements."

Thus, DOE's Order 435.1 must be declared invalid under *Chevron.* The Court will therefore grant NRDC's motion for summary judgment and deny DOE's cross-motion. The Court did not rely on an extra-record material and so will deem moot the motion to strike that material. The Court will also grant DOE's motion to supplement the administrative record to correct photocopying errors and replace items inadvertently omitted from the administrative record.

NRDC seeks injunctive relief prohibiting DOE from taking any actions inconsistent with NWPA, including plans for grouting with concrete for permanent disposal any HLW in Washington, Idaho, and South Carolina. There is no indication, however, that DOE will ignore this decision and continue with any plan inconsistent with NWPA. Thus, the Court finds no need at this time to issue injunctive relief. Should that need arise in the future, plaintiffs are free to re-open this case and pursue that relief. The Court will prepare a separate Judgment as required by Federal Rule of Civil Procedure 58.

### JUDGMENT

In accordance with the Memorandum Decision filed with this Judgment,

NOW THEREFORE IT IS HEREBY ORDERED, ADJUDGED, AND DECREED, that the plaintiffs' motion for summary judgment (docket no. 56) is hereby GRANTED, and defendants' motion for summary judgment (docket no. 66) is hereby DENIED.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED, that the DOE has violated NWPA by promulgating Order 435.1 as it relates to incidental waste, and that portion of Order 435.1 is declared invalid under the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.*

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED, that the motion to strike (docket no. 68) is DEEMED MOOT, and the motion to supplement administrative record (docket no. 73) is hereby GRANTED.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED, that this action is hereby DISMISSED IN ITS ENTIRETY.